**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Thomas Doran, | No. CV-10-8155-PCT-LOA |
| Plaintiff, | **ORDER** |
| vs. | |
| Michael J. Astrue, Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff seeks judicial review of the Commissioner of Social Security's denial of his application for disability insurance benefits and supplemental security income under Title II and XVI, respectively, of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-33, 1381-83f, 405(g). The parties, who have consented to proceed before a United States Magistrate Judge, have filed briefs in accordance with Local Rule of Civil Procedure 16.1. (Docs. 23, 23, 27) After review of the record, briefing, and the applicable law, the decision of the Commissioner is reversed and the matter is remanded for further proceedings.

**I. Procedural Background**

On October 31, 2006, Plaintiff filed applications for disability insurance benefits with an alleged onset date of January 24, 2006, due to anxiety attacks and seizures. (Tr. 112-120[1]) Plaintiff's applications were denied initially and upon reconsideration. (Tr. 49-51, 67-74, 78-80) Plaintiff requested a hearing before an administrative law judge ("ALJ").

---

[1] Citations to "Tr. __" are to the transcript of the administrative proceedings.

(Tr. 81-84, 120) After conducting a hearing, on August 24, 2009, the ALJ found Plaintiff not disabled within the meaning of the Act. (Tr. 16-24) This decision became the final decision of the Commissioner of Social Security when the Social Security Appeals Council denied Plaintiff's request for review. (Tr. 1-5) Plaintiff now seeks judicial review of that decision, pursuant to 42 U.S.C. § 405(g).

## II. Facts

### A. Plaintiff's Background

Plaintiff was born on December 3, 1954. He was 54 years old at the time of the ALJ's decision. (Tr. 31-32) He has a high-school equivalent education ("GED"), and two years of college. (Tr. 31-32) Plaintiff served in the military from 1974 to 1981. (Tr. 238, 585) His subsequent employment included administrative work, and work at a bank and a gift shop. (Tr. 31-32, 126-27, 148-49, 238, 260) The vocational expert classified Plaintiff's past relevant work as skilled and semi-skilled, ranging from sedentary to a medium exertional level. (Tr. 44-46)

### B. Medical Evidence Regarding Physical Impairments

As the ALJ noted, Plaintiff suffers from degenerative disc disease of the cervical spine, degenerative changes of the lumbar spine, anxiety disorder with panic attacks, depression, and a seizure disorder. (Tr. 18) Plaintiff received the following medical treatment and examinations related to these conditions.

### 1. Medical Evidence before January 2006 onset date

Plaintiff sought medical treatment for depressive symptoms and panic attacks at the Phoenix Department of Veteran's Affairs ("VA") in April 2003. (Tr. 228, 238-46, 248-50) Amy Frazier, M.D., a psychiatrist at the VA, began treating Plaintiff in November 2005. (Tr. 385-86)

During 2005, Plaintiff also saw VA neurologist William Lawrence, M.D., for complaints of intermittent episodes where Plaintiff experienced head pain that "raise[d] his brow," and caused his head to tilt to the left and then radiated down his shoulder and left arm, which doctors opined could be seizures or related to a psychological condition. (Tr. 239-40,

1  250-51) An EEG on January 27, 2005 was abnormal and suggested "some underlying borderline irritability." (Tr. 242, 251) A February 2005 CT scan of Plaintiff's brain was unremarkable. (Tr. 257-58)

Plaintiff also complained to Dr. Lawrence of radiating head and neck pain, which he said began in 2003. (Tr. 250-52) An MRI of Plaintiff's cervical spine on December 7, 2005, showed degenerative disc disease with disc space narrowing and multiple disc protrusions with encroachment of the spinal cord. (Tr. 240-41, 253-54, 256-57, 425) Plaintiff also complained of low back pain, and a lumbar MRI showed disc protrusion at L4-5 that did not touch the nerve root, a disc bulge at L3-4, with a slight propensity touching the nerve root, and spinal stenosis. (Tr. 255-56)

**2. Medical Evidence after January 2006 onset date**

In January 2006, Dr. Oygar, Chief of Service at the Veterans Affairs ("VA") neurological unit in San Diego, California, reviewed Plaintiff's imaging, consult, and clinical notes. Dr. Oygar recommended further testing and possible spinal fusion surgery. (Tr. 421)

A CT scan of Plaintiff's cervical spine on March 8, 2006 showed reversal of the normal curvature of the neck, moderate to severe degenerative disc disease at C3-C7, bone spur formation encroaching the dural sac at C3-C7, and hypertrophic spur formation with encroachment on the neural foramina at C4-C7. (Tr. 250-53, 424)

In a May 2006 appointment, Dr. Frazier noted that she had not seen Plaintiff since November 2005. She said that Plaintiff's "seizures" were less frequent, and that he felt better since a recent increase in his medication. Upon examination, Dr. Frazier noted that Plaintiff was fully oriented and well-groomed, but his mood was depressed. Plaintiff had a sad and tired affect, but good eye contact, fluent and non-pressured speech, good impulse control, no agitation or retardation, no thought disorder, and no suicidal ideation. Dr. Frazier diagnosed depression and anxiety, and increased the dosage of Plaintiff's antidepressant medication. Dr. Frazier referred Plaintiff to the VA's medical psychology department. (Tr. 228-29)

On August 4, 2006, an EMG of Plaintiff's upper extremities for his complaints of

radiating cervical pain was normal. (Tr. 225-26)  Later in August, Plaintiff saw Samuel Foote, M.D., a primary care physician at the VA. Plaintiff reported that he was doing much better with the anxiety attacks/seizure episodes. (Tr. 222-23)  Upon examination, Plaintiff was not in acute distress, and had full motor strength in all four extremities and no focal motor weakness.  (Tr. 223) Another examination showed weak left biceps and abnormal left biceps reflex. (Tr. 224) Dr. Foote diagnosed multiple psychological problems including anxiety attacks.  He stated that it was not unreasonable to do a CT scan and an EEG, although he opined it was more likely that Plaintiff's seizure-like episodes were anxiety attacks. He prescribed pain medication and referred Plaintiff to a neurosurgeon.  (Tr. 222-25)

In September 2006, Plaintiff complained by telephone to the VA of intermittent low back pain down his right buttocks to the front of his leg and right knee for the past two weeks. He said that his pain lessened with movement, stretching, walking 20 to 25 minutes every other day, and medication.  Plaintiff was instructed to treat himself at home, and to call back if he did not improve.  (Tr. 220-21, 345-37)

In February 2007, Plaintiff saw Keith Cunningham, M.D., for a consultative physical examination in connection with his application for benefits.  Plaintiff said the main reason he could not work was schizophrenia and depression, although he also reported occasional left neck, shoulder, arm, and hand pain. Plaintiff walked to and from the examination room independently and could mount and dismount the examination table without assistance. Plaintiff had a normal gait, normal range of motion throughout his body, normal motor and sensory testing (except for pain with movement in his right hip), and no extremity edema.  His neck and back were symmetric with no muscle spasm or point tenderness, and straight leg testing (to detect nerve root irritation in the low back) was negative. Dr. Cunningham diagnosed neck, left shoulder and arm pain upon examination, showing preserved range of motion and no radiculopathy or focal neuromuscular deficits. (Tr. 260-62, 269-71)

Dr. Cunningham also completed a medical source statement, finding that Plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently with no limitations on standing, walking, sitting, climbing ramps or stairs, balancing, stooping, kneeling, crouching,

- 4 -

reaching, handling, fingering, or feeling. He found Plaintiff was limited to occasional crawling, and frequent climbing of ladders, ropes, and scaffolds, and that Plaintiff had no restrictions in working around heights, moving machinery, extreme temperatures, chemicals, dust/fumes, or excessive noise. (Tr. 263-68, 272-76)

On February 28, 2007, Plaintiff was examined by state agency psychologist, Charles Jay House, Ph.D., in connection with his application for benefits. (Tr. 282) Plaintiff reported that he spent his days caring for his fish, cats, and two small dogs, and watching television or listening to the radio. Plaintiff stated that he did not drive. Plaintiff said he changed his clothes only every three days because bending is difficult, tended to his hair every four days, and ate every two days. Plaintiff said he did not like or trust people and has a short temper. (Tr. 283) Upon examination, Plaintiff had no obvious problems with gait or balance. (Tr. 284) He had clear speech, intact language skills, and some problems with insight and judgment. Plaintiff was at times angry, and other times polite and cooperative, and showed signs of paranoid and schizotypal traits. (*Id.*) Dr. House noted that he was "not aware of any type of seizure that would match [Plaintiff's] description" of his symptoms. (Tr. 285) After performing intelligence, memory, and visual-motor skills testing, Dr. House diagnosed anxiety disorder versus post-traumatic stress disorder, rule out history of alcohol and cannabis abuse, and a personality disorder with schizotypal traits. (Tr. 288) Dr. House concluded that Plaintiff

> apparently does not think much of human beings and tends to perceive himself as being a victim of others. It is hard to say how much of what he told me might be factual and what might be reflective of a delusional disorder or may be fabricated. . . . . His statements and behaviors suggested paranoid tendencies, as well as schizotypal traits. He apparently does have some problems with anxiety and irritability. It does appear he may be using projection as a major defense mechanism . . . . I feel that the IQ and memory tests probably underestimate his actual level of ability. Psychological factors do seem to be affecting his ability to function, however . . . . This individual has reportedly gone through the Social Security process in the past. It might be helpful to review these previous records to see if there are any inconsistencies that might be noteworthy.

(Tr. 288-89)

Several days later, Dr. House completed a "Medical Source Statement Ability to do

Work Related Activities (Mental)." He found that Plaintiff was not significantly limited or had no limitations in several areas, and had "moderate" mental limitations in five work-related areas of functioning: working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interacting with the general public; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 277-81)

In March 2007, Thomas Glodek, M.D., a state agency physician, reviewed the record and completed a Physical Residual Capacity Assessment. He found that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, and sit and stand/walk about six hours each in an eight-hour workday, and that Plaintiff had no postural, manipulative, or environmental limitations. (Tr. 308-15)

In April 2007, Heather Barrons, Psy.D., a state agency psychologist, reviewed the record and completed a Mental Residual Functional Capacity Assessment. She found that Plaintiff was not significantly limited in a number of areas and was moderately limited in a number of other areas. (Tr. 290-91, 294-307) Based on these limitations, Dr. Barrons found Plaintiff could perform simple work and "would likely benefit from an environment with minimal distractions" and "minimal contact with the general public." (Tr. 292)

Later in April 2007, Plaintiff saw Dr. Frazier for the first time since May 2006. Plaintiff reported that he felt better, was a little less depressed, and that his seizures were less frequent and intense. Plaintiff said he was still anxious some times and angered easily, and that he had bad dreams, but no hallucinations. An examination showed that Plaintiff was fully oriented and well-groomed with good eye contact, fluent speech, and good insight, good impulse control, and no agitation or retardation. (Tr. 392-93)

In May 2007, Plaintiff saw David Ramstad, M.B.A., Psy.D., upon referral from Dr. Frazier. (Tr. 545) Plaintiff said he had no friends and made jewelry that he tried to sell sometimes. (Tr. 546) An examination showed that Plaintiff was well-groomed, and had linear

and goal-directed thoughts. (Tr. 547) Dr. Ramstad diagnosed recurrent major depressive disorder without psychotic features and possible schizoid personality disorder. (Tr. 549) Dr. Ramstad explained that:

> Overall, it appears [Plaintiff] may not have exerted full efforts on testing and may have attempted to magnify areas of concern . . . . His clinical presentations on both intellectual and psychiatric function do not match test data. The exception appears to be his current depression. Therefore, the results may not accurately represent [Plaintiff's] current level of functioning . . . . [D]uring the evaluation process, he revealed presently being represented by a legal team in an attempt to obtain social security disability for both medical and psychiatric conditions this may have impacted his response pattern.

(Tr. 388, 549) Dr. Ramstad recommended medication management and short-term therapy, and concluded:

> The results of the evaluation are more severe than [Plaintiff] presents clinically and the most solid psychometric instrument is invalid. Patient motivation for more severe outcomes should be considered given the potential for secondary gain. This does not mean that he does not have psychiatric impairment but the reported level on testing exceeds observation.

(Tr. 549-50)

Later that month, Dr. Lawrence ordered MRIs of Plaintiff's neck and low back. (Tr. 329) The MRI of Plaintiff's neck showed moderate degenerative arthritic changes of the cervical spine with disc space narrowing, and osteophyte impingement upon the interverbral formina at C6-C7. (Tr. 316) The lumbar MRI showed disc space narrowing at L3-L4 and L4-L5, degenerative changes with osteophytes, and normal height and width of vertebral bodies. (Tr. 317)

The same day, Plaintiff saw therapist Merranda Marin for the results of psychological testing. On examination, Plaintiff was alert and oriented with a flat and slightly agitated affect. He had good hygiene, goal-oriented thought process, and no suicidal ideation. Ms. Marin noted that Plaintiff would follow-up with psychiatry that same day for medication management. Plaintiff, however, missed that appointment because he said he was afraid he would lose his temper. (Tr. 323)

On June 13, 2007, Plaintiff called the VA and requested anti-psychotic medication. The provider refused, noting that there was no documentation of any psychosis until several

- 7 -

days earlier. The provider noted that Plaintiff smoked marijuana, and that a substance abuse-based mood disorder should be ruled out. He also noted that Plaintiff only sporadically filled his prescriptions and had sub-therapeutic levels of his anti-seizure medications, which suggested non-compliance. (Tr. 373-74)

In July 2007, Plaintiff reported having nightmares about death and war, hearing voices, and that he did not trust people and was unable to be around others. He said his anti-anxiety medication had helped a lot. An examination showed that Plaintiff was fully oriented with good eye contact, a neutral sad affect, fairly good insight, good impulse control, no agitation or retardation, no thought disorder, no suicidal ideation, and no delusions. Plaintiff was advised to continue his medications and attend individual therapy. (Tr. 367-69)

On August 24, 2007, a psychological examination was performed at the VA. This examination was not part of the administrative record before the ALJ, but is referenced in the November 7, 2007 VA Rating Decision, finding Plaintiff disabled. (Tr. 585-86) The examination resulted in a finding that Plaintiff was "unable to secure and follow substantially gainful occupation due to [his] mental health disorder." (Tr. 586) The ALJ did not request the report of this examination.

On August 27, 2007, Plaintiff met with his social worker, who became concerned after an assessment of suicide risk. (Tr. 455) The social worker told Plaintiff to see Dr. Frazier that day. When Plaintiff saw Dr. Frazier, he said he was "tired of [Social Security] telling him he's lying and denying his claim." He said he smoked marijuana once a month, and that he still heard voices calling his name, and "people from [his] future condemning him. . . ." On examination, Plaintiff was oriented and well-groomed, had good eye contact, fluent and non-pressured speech, fairly good insight, good impulse control, a neutral and sad affect, no thought disorder, no agitation or retardation, no suicidal ideation, and no hallucination. Dr. Frazier found Plaintiff's Global Assessment Functioning ("GAF") score to be 45. (Tr. 461). Dr. Frazier diagnosed post-traumatic stress disorder (PTSD) and psychosis, and continued Plaintiff's medications. (Tr. 457-61)

On September 19, 2007, Plaintiff underwent an assessment by a social worker.

- 8 -

Plaintiff said that he was interested in "going back to work in administration, but [was] having a hard time finding a job due to 'missing teeth and psych med[ication].'" (Tr. 452) The social worker noted that Plaintiff was alert, fully oriented, cognitively intact, neatly attired, and able to provide a logical coherent history. (Tr. 451) He had appropriate interactions; good eye contact; a pleasant mood and congruent affect; normal speech; organized, linear, and goal-directed thoughts; a normal fund of knowledge; reasonable judgment and insight; appropriate thought content; and no suicidal ideation. The social worker recommended monthly sessions. (Tr. 448-52)

The next day, Plaintiff underwent an assessment by Price Locke, Ph.D., in the VA psychology department. Plaintiff moved slowly and sat with his head tilted to the right. He said that stretching helped his pain, and that stress worsened it. Dr. Price noted that Plaintiff appeared to be a chronic pain patient, and scheduled Plaintiff to attend the next group session. (Tr. 447-48)

In October 2007, a social worker noted that Plaintiff was alert and oriented with an improved mood since being back on medication. Plaintiff reported that he had started making jewelry, which provided him with income and "internal peace." He requested help finding employment, and the social worker noted he was a candidate for an employment-related program. She also suggested that Plaintiff attend a grief group. (Tr. 444-45)

One month later, Dr. Frazier completed a medical source statement for the Arizona Department of Economic Security. She opined that Plaintiff had a physical or mental incapacity that prevented any substantial gainful employment, that lasted at least 12 months. (Tr. 519-20)

On November 7, 2007, the VA notified Plaintiff that he was entitled to non-service connected disability, effective July 16, 2007 (the date the VA received his claim). (Tr. 585) The VA based its determination on Dr. Frazier's August 24, 2007 examination, an examination for housebound status dated October 24, 2007, and information from Plaintiff's Social Security Administration file. (Tr. 585-86)

In April 2008, Dr. Lawrence reviewed Plaintiff's MRI. Plaintiff declined surgery. (Tr. 437)

In June 2008, Plaintiff established care at a different VA facility. At a June 16, 2008 appointment, his main complaint was chronic neck pain with left shoulder involvement. On examination, Plaintiff was anxious, but in no acute distress. He had decreased lower extremity strength on the left compared to the right, and had a decreased triceps reflex on the left, but intact sensation. After reviewing Plaintiff's 2006 CT scan, a nurse practitioner diagnosed cervical radiculopathy, PTSD, and seizure disorder. She scheduled a cervical MRI, (Tr. 535-37), which showed multilevel mild to advanced osteogenic and discogenic degenerative changes, most conspicuous at C3-C4 and C4-C5; borderline impingement at C5-6 and C6-7; and multilevel neuroforaminal encroachment. (Tr. 564-66)

Another MRI was performed on July 28, 2008 to monitor Plaintiff's cervical degenerative disc disease. Plaintiff was found to have impingement of the spinal cord at C3-C4. He also had "considerable cord impingement" at C4-C5 as well as moderately severe ventral canal encroachment and moderately severe bilateral neuroforaminal encroachment. Moderate to moderately severe bilateral neural foraminal encroachment was also present at C6-C7. (Tr. 565)

On October 8, 2008, Plaintiff sought emergency care for an increased frequency of seizures during the past week. He said that he had been under stress, and was also experiencing neck and head pain. An examination showed Plaintiff was anxious, but in no acute distress. Plaintiff was alert and oriented with full motor strength and intact cranial nerves. (Tr. 528) A CT scan of his head was normal. (*Id.*) The physician increased the dosage of Plaintiff's anxiety medication. (Tr. 527-28)

**C. Hearing Testimony**

An administrative hearing was held on April 22, 2009. (Tr. 27-46) Plaintiff and vocational expert, Sandra Richter, testified at the hearing. Plaintiff testified that he had constant, burning, and severe neck pain, which caused difficulty concentrating. (Tr. 33) He also testified that he had constant back pain, that sometimes radiated to his hips and legs, and numbness in his left arm if he did not "move it a lot." (Tr. 33-34, 37) He said his left arm was "very weak" and that his left leg was also weak. (Tr. 35) Plaintiff said that the combination of walking,

standing, and sitting, as well as his medications helped his pain, but did not completely alleviate it. (*Id*.)  He later said that "being confined to one position very long," standing, sitting, bending, lifting, and turning aggravated his back pain.  (Tr. 37)   He testified that he usually lies on his back with his head propped up and pillows under knees for a couple hours every day.  (Tr. 38)  He said he had not had any shots in his back and had declined surgery on his neck. (Tr. 36)   He explained that the risks associated with surgery - namely paralysis, "scare[d] him to death."  (Tr. 36)

Plaintiff said he did not sleep well at night and was tired during the day.  (Tr. 38-39) He said doctors were not sure whether he suffered from seizures, but that he still took seizure medication. (Tr. 39)  He said that he, and some of his doctors, felt his seizures were related to anxiety or panic attacks.  (Tr. 39)  He said that stress brought on the seizures, and made his pain worse. (Tr. 40)   He said he got along with other people "very badly," and found them "scary, mistrusting, judgmental, and they always want something from you." (Tr. 40)  He said he had problems with anger and aggression and does not want to go anywhere or do anything. (Tr. 40-41)  He said he sometimes hears voices, and is depressed "98 percent of the time."  (Tr. 42)

Plaintiff testified that he had difficulty turning his head in different directions, and using his arms for activities such as shaving and washing his hair.  (Tr. 36)  He said reaching was also difficult, especially with his left arm.  (Tr. 37)  He said he could sit 40 minutes, but needed to walk around for half an hour.  (Tr. 38)  He said his pain was sometimes so bad he had to lie down.  (Tr. 38)  He said he did not shower regularly and that, except for taking walks, he left the house only once a month to go shopping late at night to avoid people.   (Tr. 42, 44)   He said he did not drive. (Tr. 44)   Plaintiff testified that he had previously thought of suicide and hurting other people, and that his medication sometimes helped. (Tr. 42-43)  He said that he lived only with his pets, did very little cooking, and cleaned about every three days.  (Tr. 43)

The vocational expert testified that Plaintiff's past work was semi-skilled to skilled and light. (Tr. 45) The ALJ asked the vocational expert to assume a person of Plaintiff's age, education, and work experience who was able to perform light work with simple or detailed work tasks, minimal distractions, and minimal public contact. (Tr. 46)  The vocational expert

testified that such a person could not perform Plaintiff's past relevant work, but could perform other unskilled and light jobs existing in the national economy, including packager, production worker, and inspector. (*Id.*)

Plaintiff's attorney then posed a hypothetical question, based on Plaintiff's symptom testimony. The vocational expert testified that there would be no work for an individual with those limitations. (Tr. 47) Plaintiff's counsel also posed another hypothetical question that included the "moderate" limitations contained in the report of psychologist Dr. House, who examined Plaintiff on behalf of the agency. (Tr. 47, 277-281) The vocational expert testified that there would be no work for an individual with those limitations. (Tr. 47)

**D. The ALJ's Decision**

On August 24, 2009, the ALJ denied Plaintiff's application for disability benefits after applying the sequential evaluation process, 20 C.F.R. § 404.1520(a)(4). (Tr. 16-24) At the first step, the ALJ found that Plaintiff had not performed any substantial gainful activity since the disability onset date, January 25, 2006. (Tr. 16) At the second step, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease of the cervical spine, degenerative changes of the lumbar spine, anxiety disorder with panic attacks, depression, and a seizure disorder, most likely related to the anxiety attacks." (Tr. 18, 23) At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 18, 21-22, 23) After considering the entire record, the ALJ found that Plaintiff's subjective complaints were not entirely credible. (Tr. 23) The ALJ found Plaintiff had "the residual functional capacity to perform light work as defined in 20 CFR § 404.1567(b) and 416.967(b). The claimant can perform simple or detailed work tasks with minimal detractions and minimal contact with the general public." (Tr. 23) At the fourth step, the ALJ found that Plaintiff could not perform his past relevant work. (Tr. 22) Finally, based on the testimony of the vocational expert, and considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that Plaintiff could perform "jobs that exist[] in significant numbers in the national economy. . . [including] packager, production worker and inspector."

(Tr. 24) The ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 24)

When assessing Plaintiff's credibility, the ALJ stated that, "the undersigned finds the functional limitations resulting from the claimant's impairments are less serious than he has alleged." (Tr. 18) The ALJ found that "the objective evidence supports a finding that claimant's impairments, while imposing some restrictions, do not prevent him from engaging in all work related activities." (Tr. 18) The ALJ noted the VA's award of permanent non-service disability. (Tr. 21) The ALJ explained that the VA's determination was not binding on the Social Security Administration, but that the ALJ "must evaluate the medical evidence contained in the record" to determine whether Plaintiff was disabled under the Act. (Tr. 21) The ALJ further noted that the "basis of the finding of disability by the VA is unclear given that a previous VA evaluator found all testing invalid (exhibit B12F/26-31)." (Tr. 21)

### III. Applicable Legal Standards

#### A. Sequential Evaluation Process

A "disability" is defined by the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is disabled if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the initial burden of proving disability. 42 U.S.C. § 423(d)(5); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). If the claimant shows he is unable to perform past relevant work, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work that exists in the national economy. *Takcett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

An ALJ determines an applicant's eligibility for DIB by following the five steps listed below:

(1) determine whether the applicant is engaged in "substantial gainful activity";

- 13 -

(2) determine whether the applicant has a "medically severe impairment or combination of impairments";

(3) determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

(4) if the applicant's impairment does not equal one of the "listed impairments," determine whether the applicant has the residual functional capacity to perform his or her past relevant work;

(5) if the applicant is not capable of performing his or her past relevant work, determine whether the applicant "is able to perform other work in the national economy in view of his [or her] age, education, and work experience."

*Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(b)-(f)). At the fifth step, the burden of proof shifts to the Commissioner. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).

Applying the five-step analysis, the ALJ found that: (1) Plaintiff has not engaged in substantial gainful activity since January 25, 2006; (2) Plaintiff has a severe impairment; and (3) Plaintiff's impairment does not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. At steps four and five, the ALJ found that, although Plaintiff does not retain the residual functional capacity to return to his past relevant work, he has the residual functional capacity to perform other jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that Plaintiff was not disabled under the Social Security Act.

**B. Standard of Review**

A district court must affirm the Commissioner's findings if they are supported by substantial evidence and are free from legal error. *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (*per curiam*); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). In determining whether substantial evidence supports a decision, a

court considers the record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Sandgathe,* 108 F.3d at 980 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995)).

The ALJ is responsible for resolving conflicts, determining credibility, and resolving ambiguities. *Andrews*, 53 F.3d 1035 at 1039; *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). If sufficient evidence supports the ALJ's determination, the court cannot substitute its own determination. *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990). Moreover, if a reasonable mind could understand the evidence to support either outcome, a court must defer to the ALJ's decision. *Richardson v. Sullivan*, 981 F.2d 1016 (9th Cir. 1992) (citations omitted). If on the record as a whole, substantial evidence supports the ALJ's decision and it is free from legal error, this court must affirm it. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989); 42 U.S.C. § 405(g). Finally, a court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that "an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)).

**IV. Analysis**

In support of his request for review of his claim for disability benefits, Plaintiff presents the following claims:

1. The ALJ erred by failing to find that Plaintiff's condition met, or equaled, criteria for presumptive disability in the Listing of Impairments, or alternatively, failing to obtain medical expert testimony on this issue.

2. The ALJ erred by rejecting the assessment of the agency's examining psychologist, Charles House, Ph.D.

3. The ALJ erred by disregarding the Veteran Affairs' determination that Plaintiff was disabled.

4. The Court should remand for determination of disability benefits.

Defendant opposes Plaintiff's assertions. The Court will address Plaintiff's claims below.

**A. Determination Regarding Presumptive Disability**

Plaintiff argues that the ALJ's determination at step three, that his impairments did not met the requirement of Listing 1.04A, was not based on a correct legal standard. Plaintiff asserts that the ALJ's boilerplate statement that none of Plaintiff's impairments meet or medically equaled any of the listed impairments was legally insufficient. The Commissioner counters that the ALJ's determination at step three was sufficient.

At step three of the five-part sequential evaluation for determining disability, the Commissioner must determine whether a claimant's impairment or combination of impairments meets or equals one of the specific listed impairments. 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The physical and mental conditions contained in the Listings "are considered so severe that they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs." *Lester v. Chater*, 81 F.3d 821, 828 (9th Cir. 1995). The Listings were "designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). If a claimant establishes that his impairments meet or equal a Listing, he will be found presumptively disabled. 20 C.F.R. § 404.1525-404.1526, 416.925-416.926.

For an impairment or combination of impairments to meet a Listing, all of the criteria of that Listing must be satisfied for the requisite durational period. *Zebley*, 483 U.S. at 530 (stating that the impairment "must meet all of the specific medical criteria" in the Listing); see also 20 C.F.R. 416.909 and 416.925(c)(3); Social Security Ruling ("SSR") 83-19 ("An impairment meets a listed condition in the Listing of Impairments only when it manifests the specific findings described in the set of medical criteria for that listed impairment.").

For an impairment or combination of impairments to equal a Listing, the claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Zebley*, 493 U.S. at 531; *Tacket*, 180 F.3d at 1099; C.F.R. § 416.926(a)-(b); SSR 83-19 (An impairment is "equivalent" to a Listing only if a claimant's symptoms, signs, and laboratory findings are "at least equivalent in severity" to the criteria for the listed impairment most like the claimant's impairment.).

Here, Plaintiff claims that his cervical condition meets Listing 1.04A - disorders of the spine - because he has established spinal cord impingement and moderately severe neural foraminal encroachment; cervical radiculopathy; rotation of the cervical spine limited to 20 degrees to the left or right; weakness of the left biceps, reduced grip strength, weakness of the left upper extremity; and an absent left biceps reflex and decreased left triceps reflex. (Doc. 23 at 18; Tr. 565, 425, 537, 424, 338, 329, 350, 329, 537, 349, 537) Plaintiff argues that the ALJ erred in concluding that Plaintiff did not meet or equal Listing 1.04A because the ALJ did not evaluate the relevant evidence *before* reaching his conclusion at step three. The Court agrees.

"An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). "A boilerplate finding [at step three] is insufficient to support a conclusion that a claimant's impairment" does not meet or equal a listing. *Id*. In *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990), the Ninth Circuit held that an ALJ must explain and evaluate the evidence that supports his step three finding. An ALJ's unexplained finding at step three that "[t]he claimant has failed to provide evidence of medically determinable impairments that meet or equal the Listings," was reversible error, because the ALJ failed to explain adequately his evaluation of why certain medical evidence of record and/or the combined effects of the claimant's impairments did not equal the Listing in question. *Id*.

Here, Plaintiff specifically argued at the administrative hearing that his condition met the requirements of Listing 1.04A. (Tr. 30) The ALJ concluded that Plaintiff's "degenerative disc disease of the cervical spine, degenerative changes of the lumbar spine, anxiety disorder with panic attacks, depression, and a seizure disorder . . . are severe [impairments] when considered in combination. . . . The [ALJ] find[s] the claimant has no impairment, or combination of impairments, that meets or equals in severity the appropriate medical criterial of any impairment listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. 18) The ALJ, however, did not evaluate and explain the relevant medical evidence before reaching this conclusion. Except for the foregoing statement, the ALJ provided no explanation to support his finding. The ALJ's conclusory statement is the type of "boilerplate finding" the Ninth Circuit

has found insufficient at step three. *Lewis*, 236 F.3d at 512. Defendant argues that the ALJ's finding is sufficient because it is supported by the opinion of Dr. Glodek, the reviewing state agency physician, that Plaintiff's impairments do not meet or equal any listed impairment. (Doc. 24 at 18; Tr. 22) A district court, however, is constrained to review the reasons the ALJ asserts for his decision. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), and may not affirm on grounds or reasons the ALJ did not invoke in making his decision. *Stout v. Commissioner*, 454 F.3d 1050, 1054 (9th Cir. 2006). Because the ALJ did not cite or discuss Dr. Glodek's opinion in finding that Plaintiff did not meet or equal Listing 1.04A, the Court may not consider it. This is true even though the ALJ briefly mentioned Dr. Glodek's opinion at step four of the sequential evaluation when assessing Plaintiff's residual functional capacity. (Tr. 22) The sequential analysis is meant to be applied in order, so that, if a claimant is found disabled at any step, a finding of disability is required and the evaluator should not proceed to the next step. 20 C.F.R. § 404.1520(a)(4) ("The sequential evaluation process is a series of five steps that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step."). If a claimant is found to meet a listed impairment at step three, a finding of disability is mandated. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. 416.920(a)(4)(iii). Thus, the ALJ's later finding at step four does not cure a defect at step three. *Walraven v. Astrue*, No. CV-07-2041-PHX-GMS, 2008 WL 5427735, at * 3-4 (D. Ariz., December 31, 2008) (finding that ALJ committed error by failing to explain and support step-three finding and explaining that later step-four analysis did not obviate the need for a step-three finding).

Where Plaintiff specifically argued that his cervical condition met or equally a specific Listing, the ALJ's boilerplate finding was not sufficient to support the conclusion that Plaintiff's cervical impairment did not meet or equal Listing 1.04A. *Lewis*, 236 F.3d at 512; *Marcia*, 900 F.2d at 176; *Nevens v. Astrue*, No. EDCV 10-01409 CW, 2011 WL 3320063, at * 5 (C.D.Cal., July 29, 2011) (finding ALJ's boilerplate finding insufficient to support determination that Plaintiff's knee impairment did not meet or equal Listing 1.02A and remanding for further proceedings). *But see DeBotello v. Astrue*, No. CV-10-1203-PHX-JAT, 2011 WL 3292401, at

* 9 (D.Ariz., Aug. 1, 2011) (finding ALJ's analysis of step three adequate where claimant "did not mention or argue for any medical listing" during the administrative hearing.). The ALJ's failure to explain his reasoning is troublesome in view of evidence in the record that showed that Plaintiff had spinal cord impingement and moderately severe neural foraminal encroachment; cervical radiculopathy; limited rotation of the cervical spine; weakness of the left bicep, reduced grip strength, absent left biceps reflex, and decreased left biceps weakness. (Tr. 565, 425, 537, 424, 338, 329, 350, 329, 537, 349)

In view of the evidence in the record, the ALJ's conclusory determination was insufficient to support the conclusion that Plaintiff's cervical impairment did not meet or equal Listing 1.04A. On remand, the ALJ must evaluate the evidence in the record before reaching a conclusion as to whether Plaintiff's cervical impairment meets or equals Listing 1.04A.

Plaintiff also contends that the ALJ erred by rejecting the assessment of the agency's examining psychologist, Charles House, Ph.D., and that the ALJ erred by disregarding the Veteran Affairs' determination that Plaintiff was disabled. The Court need not consider these arguments in light of the need for reversal on other grounds. *Marcia*, 900 F.2d at 177 n. 6 ("Because we remand for reconsideration of step three, we do not reach the other arguments raised."); *Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985) (*per curiam*) ("Because the 'misuse of the expert's testimony alone warrants reversal,' we do not consider the appellant's other claims.").

### B. Remand for Further Proceedings

The decision to remand for further proceedings is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1175-78 (9th Cir. 2000). "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In Social Security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security

case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate." *Id.* (alteration in original) (internal quotation marks omitted). The Court finds that remand for further proceedings is appropriate for clarification regarding the ALJ's determination at step three.

**V. Conclusion**

Based on the foregoing, the Court finds that the ALJ's determination at step three was legally erroneous.

Accordingly,

**IT IS ORDERED** that the decision of the Commissioner is **REVERSED** and the case **REMANDED** to the ALJ for further proceedings consistent with this order. The Clerk of Court is directed to enter judgment in favor of Plaintiff and against Defendant Michael J. Astrue, Commissioner of Social Security.

Dated this 12th day of September, 2011.

*Lawrence O. Anderson*
Lawrence O. Anderson
United States Magistrate Judge